945 So.2d 52 (2006)
In re Jeremiah J. SHIPLOV, D.M.D. Permanent Assignment.
No. 2005-CA-0498.
Court of Appeal of Louisiana, Fourth Circuit.
October 18, 2006.
Rehearing Denied November 30, 2006.
Opinion Denying Rehearing December 6, 2006.
*54 W. Michael Cady, Cady & Cady, Shreveport, LA, for Appellant, Jeremiah J. Shiplov, D.M.D.
M. Thomas Arceneaux, Blanchard, Walker, O'Quin & Roberts, Shreveport, *55 LA, for Appellee, Louisiana State Board of Dentistry.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, III, Judge MICHAEL E. KIRBY).
MICHAEL E. KIRBY, Judge.
This appeal results from a Judgment of the Civil District Court for the Parish of Orleans, which reviewed an administrative decision of a disciplinary committee of the Louisiana Board of Dentistry (hereinafter "Board"). The Board had found that Jeremiah J. Shiplov, D.M.D. (hereinafter "Dr. Shiplov") had divided fees with a non-dentist, failed to personally retain patient records and did not co-operate with the Board's investigation, all contrary to the provisions of the Louisiana Dental Practice Act. The Board ordered Dr. Shiplov to pay all of its costs associated with the disciplinary hearing.
Dr. Shiplov sought review of these rulings and on April 8, 2004 the trial court rendered judgment setting aside the assessment of fees and dismissing Dr. Shiplov's remaining assignments of error. By an amended judgment of December 6, 2004 the trial court reiterated its prior ruling but remanded the case for a hearing on the assessment of costs at which Dr. Shiplov could present relevant evidence.
Dr. Shiplov appeals assigning numerous errors. We have grouped his assigned errors into the following categories: 1) errors relating to the finding that he split fees with a non-dentist in violation of La. R.S. 37:776; 2) errors regarding the Board's determination that he failed to maintain written patient records in violation of La. R.S. 37:757; 3) errors pertaining to the Board's determination that he failed to co-operate with its investigation of him; 4) errors associated with the conduct of the proceedings; 5) errors relating to the Board's assessment of costs and fees.
The Board has answered the appeal assigning as error the trial court's setting aside the assessment of fees and costs and ordering an evidentiary hearing thereon. Alternatively the board asks that the additional costs of the evidentiary hearing on the amount of costs be taxed against Dr. Shiplov.
STANDARD OF REVIEW:
Anyone aggrieved by a final decision or order in an adjudication proceeding is entitled to have that decision reviewed. Review occurs in the district court of the parish where the agency is located. La. R.S. 49:964(A)(1) and (B). A party aggrieved by the district court's decision may appeal to the appropriate circuit court of appeal as in other civil cases. La. R.S. 49:965. The Court of Appeal conducts a de novo review of the record. Marler Ford Co., Inc. v. Ford Motor Co., 04-342 (La.App. 5 Cir. 10/12/04), 885 So.2d 654; Bless Health Agency v. Louisiana Dept. of Health and Hospitals, XXXX-XXXX (La.App. 1 Cir. 5/22/06), 770 So.2d 780. Administrative decisions that are penal in nature are strictly construed. Gibbs Construction Co., Inc. v. State Dept. of Labor, 540 So.2d 268 (La.1989); Lasserre v. Louisiana Public Service Com'n, XXXX-XXXX (La.App. 1 Cir. 4/8/05), 903 So.2d 474.
FACTS:
At the administrative hearing on January 27, 2001 Dr. Shiplov testified that he was sixty-one years old and had had a military career as a navigator on aircraft before leaving active duty in 1970 to go back to school. He earned a master's degree in microbiology immunology and followed that with dental school, from which he graduated in 1977. He returned to military service as a dentist between 1977 and 1989. After retirement he *56 worked as a contract dentist for a series of entities that had professional service contracts to provide dental services at Barksdale Airforce Base in the Shreveport area. He was paid an hourly salary and provided equipment and staff by either his employer or the military.
For a time Barksdale stopped using contract dentists so Dr. Shiplov became an associate of Dr. Larry Weeks in February of 1993 at a dental facility on Monkhouse Drive in Shreveport. As his compensation Dr. Shiplov received fifty percent of Dr. Weeks' collections. After some time Dr. Weeks moved his practice to East 70th Street and Dr. Shiplov continued at this new location for a short time.
Sometime in 1997 Dr. Shiplov, who had returned to full time contract work at Barksdale, was approached by either Dr. Wilkins or Mr. Dudley about coming back to work at the Monkhouse Drive facility. Mr. Dudley, who was not a dentist but a technician who made dentures and other dental prostheses, owned the building. Dr. Wilkins, a dentist, did the denture work at this location but he did not do general dentistry. If Dr. Wilkins encountered patients who needed general dentistry work he would refer them to Dr. Shiplov. Dr. Shiplov saw patients on Monkhouse Drive mostly on Saturday mornings two or three times a month.
In addition to the building Mr. Dudley owned the dental chairs and other equipment but Dr. Shiplov provided some of his own instruments. Dr. Shiplov authorized a yellow pages advertisement under his name for 1997. The telephone number in the ad was actually for a telephone listed in Mr. Dudley's name. Dr. Wilkins' name did not appear in the ad, apparently because he was party to a non-competition agreement that precluded his practice of general dentistry. There was another ad the following year but Dr. Shiplov denied authorizing it.
In return for seeing patients at Monk-house Drive on Saturday mornings Dr. Shiplov testified he had a verbal agreement with Mr. Dudley whereby he would keep fifty percent of the fees he generated and the other fifty percent would be placed into a "dental management fund." At a hearing held September 21, 2000 pursuant to La. R.S. 49:961(c) Dr. Shiplov testified that he understood it would be legal for Mr. Dudley to act as dental manager. He formed this understanding from what he heard through Dr. Wilkins and Mr. Dudley. Subsequently an attorney, George Mills said the arrangement was legal. The record reveals that Mr. Mills was Mr. Dudley's attorney.
The dental management fund operated by Dr. Shiplov retaining the cash that came in on any given Saturday and leaving the checks or insurance forms for a secretary/receptionist to deal with. Dr. Shiplov did not prepare deposits that went into the fund; he could not remember the name of the account, nor the bank it was in nor the account number. His name was not on the account and he did not sign checks. He never saw a bank statement nor reconciled the account.
Dr. Shiplov testified this fund was to be used to pay the expenses associated with his practice at Monkhouse Drive, but his testimony provides a dearth of information concerning the actual operation of the fund. He testified the yellow page ad "came out of the management fund" but he never saw a check written out of the fund to the phone company or to anyone else except himself. There was a receptionist in the office who set up his appointments and who also worked for Mr. Dudley, but Dr. Shiplov had no agreement with Mr. Dudley as to how her salary was apportioned between them. Dr. Shiplov considered *57 this to be part of the overhead, but he had no definite agreement as to what the overhead would be, although he noted that "there was a lot of repairs and stuff that had to be done." Any money left after the payment of overhead was to be paid to him, but he rarely received any. Significantly, he never received an invoice for rent or other expenses and he did not get an accounting for expenses from Mr. Dudley.
To determine whether he was being fairly treated under his agreement the doctor only paid attention to his cash collections on any given day. The record reveals that in 1997 Dr. Shiplov received an IRS form 1099 from "Professional Denture" showing that he received $4,910.00 from the Monkhouse Drive location. The amount was correct, but Dr. Shiplov was surprised at the Payer, thinking it should have been his dental management fund. The Schedule C to his tax return for that year reveals no expense deduction related to his Monkhouse Drive practice.
Concerning the record-keeping charge, Dr. Shiplov testified that at the time of the hearing he did not have in his possession any records for the patients he saw at Monkhouse Drive. He contended those records were in the clinic. When he left Monkhouse Drive he did not ask Mr. Dudley for the records "because they stay with the client" and because Dr. Wilkins would still be operating the clinic and someone else would probably come in to do the general dentistry. The patients were more likely, he opined, to return to Monkhouse Drive than to try to find him at a new location. After the Board began making inquiries of him Dr. Shiplov requested the records from Mr. Dudley several times; he only received inconsistent excuses as to why they were not available: They had been stolen, burned or sold. However, he testified without equivocation that every time he treated a patient he made a record of the procedure performed. An assistant or secretary kept the financial record of the procedure. The records were then filed in a cabinet in the office.
When questioned about the Board's allegation that he failed to cooperate, Dr. Shiplov acknowledged receiving a subpoena in March of 1998 to which he responded with documents and a telephone conference with the Board's counsel. Thereafter by letter of September 3, 1999 the Board requested certain documents "to the extent you have not provided such documents previously." When shown this letter at the hearing Dr. Shiplov acknowledged receiving it and commented "and it's essentially asking for the same thing." When it arrived he perceived it to be harassment. Subsequent interrogation revealed that this letter sought records from April 1, 1998 through September 30, 1998 whereas the previous request was for records from January 1, 1997 through March 31, 1998.
The September 3, 1999 letter also asked Dr. Shiplov to contact counsel for the Board to arrange a deposition. Dr. Shiplov responded by letter of September 21, 1999 stating that he had not worked at Monkhouse Drive since January of 1998 and that he had "sought counsel and the lawyer agrees that this current situation does not apply to me." The letter was silent about making arrangements for a deposition. Thereafter by letter of October 7, 1999 Dr. Shiplov wrote Board counsel to advise that he had decided to assert his constitutional privileges "as stated in La. R.S. 37:776(A)(27)." His letter went on to state that he thought he was being harassed and that at least one over-zealous board member had a hidden agenda. Again, the letter made no reference to deposition arrangements and Dr. Shiplov *58 explained in his testimony that was "because of the constitutional privilege."
On November 1, 1999 the Board issued another subpoena to Dr. Shiplov which he admitted receiving. The subpoena called for him to appear and give testimony on December 8, 1999 and to bring certain specified documents with him. Dr. Shiplov replied by letter of December 3, 1999 informing the Board that he would not be attending the scheduled deposition because he considered "this matter a witch-hunt which is unreasonable and disrespectful of my already stated declaration of constitutional privilege."
As additional support for its claim that Dr. Shiplov did not cooperate with its investigation the Board relies on two letters, dated November 21, 1999 and December 4, 1999 from Dr. Shiplov to then Attorney General Richard Ieyoub. The second letter reveals that Dr. Shiplov had also written the governor's office for assistance and the doctor admitted in his testimony that he did in fact write a letter to the governor. He acknowledged that the purpose of this correspondence was to try to stop the investigation of him.
By subpoena of June 17, 2000 the Board requested of Dr. Shiplov his U.S. income tax returns for 1997, 1998 and 1999 with all exhibits and attachments. He did not furnish the documents. Contemporaneously the Board also served a testimonial subpoena, which Dr. Shiplov declined to honor.
Dr. Shiplov's testimony reveals that in his mind he did not fail to cooperate. He responded to each request made by the Board with a letter. He thought that once he declared his constitutional rights in accordance with La. R.S. 37:776(A)(27) it was incumbent upon the Board to bring the matter to Court.
Mr. C. Barry Ogden, Executive Director of the Board testified that Dr. Shiplov was not offered an informal disposition of the matter under Chapter 11 of the Board's rules because "Dr. Shiplov's history evidenced the fact that it would have been futile."
I. FEE SPLITTING CHARGES
The Board concluded that Dr. Shiplov violated "LSA-R.S. 37:775(A)(9) [sic] for dividing fees or other remuneration" with William R. Dudley, Jr. or an entity controlled by Dudley, a person not licensed to practice dentistry in Louisiana. At the outset we note the reference to La. R.S. 37:775(A)(9) is a typographical error. There is no subsection "(A)" in La. R.S. 37:775 and paragraph (9) thereof refers to advertising dental services in an unapproved medium. We think the intended reference was to La. R.S. 37:776(A)(9), which states in pertinent part:
A. The Board may refuse to issue or may suspend or revoke any license or permit or impose probationary or other limits or restrictions on any dental license or permit issued under this Chapter for any of the following reasons:
* * *
9(a) Division of fees or other remuneration or consideration with any person not licensed to practice dentistry in Louisiana, or an agreement to divide and share fees received for dental service with any non-dentists in return for referral of patients to the licensed dentists,. . . .
Dr. Shiplov complains that the committee erred in finding that a dental management fund has to be administered by a dentist and that it is only the profits of the dentist that must not be shared. First we note that we have been unable to find in the Louisiana statutes or jurisprudence *59 any reference to a "dental management fund" as used in the context of this case. Therefore, we are impelled to the conclusion that this fund was the object of a private contract between Dr. Shiplov and Mr. Dudley. However, they did not have carte blanche to make their own financial arrangements. Certainly Dr. Shiplov could have contracted with Mr. Dudley to manage his dental practice. La. R.S. 37:752(9)(e). However such a contract would have been "subject to La. R.S. 37:776" Id. which, as noted above, prohibits division of fees or other remuneration with a person not licensed to practice dentistry. We can only conclude that for this arrangement to be legal, Mr. Dudley's compensation for whatever he provided to or did for Dr. Shiplov had to be on some other basis than a portion of Dr. Shiplov's fees. The record reveals this is not the case.
Next, Dr. Shiplov asserts there was no evidence that he shared fees with Mr. Dudley or that Mr. Dudley reaped a profit from dental fees. However that assertion is belied by his own testimony that "very little money was made because the equipment was in such bad shape we had to fix it all the time. . . . Had to get a developer one time and hand pieces. . . . And the panorex needed fixing. And a compressor broke lots of time, had trouble with that." The significance of the quoted testimony is that a portion of Dr. Shiplov's fees went directly to the repair or replacement of Mr. Dudley's equipmentequipment that stayed with Mr. Dudley after Dr. Shiplov left Monkhouse Drive. It is clear the dental management fund was nothing more than a laundering device to attempt to disguise the fee splitting arrangement.
Dr. Shiplov asserts he acted reasonably in relying on legal advice that the management fund was permissible. However, the record is clear that he initially received those assurances from Dr. Wilkins and Mr. Dudley. It was only after he had begun working pursuant to the agreement that he saw a letter from Mr. Dudley's lawyer to the effect that the agreement was legal. Additionally, Dr. Shiplov already was on notice that there had been ethical problems at Monkhouse Drive previously: "I was wary to go out there because Dr. Weeks and Dr. [sic] Dudley had some problems. . . ." He understood Dr. Weeks had had disciplinary issues with the Board. In light of these facts it simply was not reasonable for Dr. Shiplov to enter into a business relationship with Mr. Dudley without getting independent legal advice as to the legitimacy of the management fund. Unfortunately for him, like the young lady from Niger, he chose to ride a tiger and ended up inside and the smile was on the face of the tiger.[1]
Dr. Shiplov urges us to read La. R.S. 37:776(A)(9)(a), supra, in such a fashion that the phrase "in return for the referral of patients to the licensed dentists" modifies both provisions of that subsection. His authority for that request is Opinion 94-315 of the Attorney General of Louisiana. In advising the Board that dentists who participated in referral plans in conjunction with preferred provider organizations were not guilty of unprofessional conduct within the meaning of the Dental Practice Act, the Attorney General said:
In defining "unprofessional conduct," La. R.S. 37:775(7) states in pertinent part:

*60 `Directly or indirectly offering, giving, receiving or agreeing to receive any fee or other consideration to or from a third party for the referral of a patient in connection with the performance of a dental service.'
Further, `unprofessional conduct' as defined above is a violation of La. R.S. 37:776. . . . [See La. R.S. 37:776(15)]
A violation of La. R.S. 37:776 requires the presence of two factors in order to be unprofessional conduct: (a) the dentist's giving or receiving a fee or other consideration to or from a third party and (b) the referral of a patient in connection with the performance of dental service. . . .
First, we note that opinions of the Attorney General are merely advisory and, while persuasive authority, they are not binding. City of New Orleans v. Board of Directors of Louisiana State Museum, XXXX-XXXX (La.3/2/99), 739 So.2d 748. But that is not why we find opinion 94-315 inapplicable to this case. There the Attorney General was construing La. R.S.37:775(7), supra. Here, Dr. Shiplov was charged with a violation of La. R.S. 37:776(A)(9)(a), a separate statute proscribing different conduct. The statute sub judice punishes (1) Division of fees . . . with any person not licensed to practice dentistry in Louisiana or (2) an agreement to divide and share fees for dental services with non-dentists in return for the referral of patients to the licensed dentists. We find these two provisions to be clear and unambiguous. Any division of fees is prohibited. Also punished is any agreement to share fees with non-dentists in exchange for the referral of patients. The clauses are disjunctive. The requirement for the referral of patients applies only to the second clause pertaining to an agreement; it does not modify the first clause pertaining to the division of fees.
The assignments of error pertaining to fee splitting are without merit.
II. PATIENT RECORDS CHARGES
The Board found that Dr. Shiplov "violated La. R.S. 37:776(A)(24) and La. R.S. 37:757(A) for failing to keep a written record of dental treatment" regarding to the amount charged and by whom the bill for such treatment was paid with respect to four patients seen on three separate treatment dates.
The relevant statutes are:
La. R.S. 37:757 Patient Records
A. Any dentist licensed to practice in this state shall keep a written record of any dental treatment for a patient, including each service performed, the amount charged for the service, and by whom the bill for the service was paid, whether by the patient or by the patient's representative or insurer.
B. The dentist shall maintain and preserve the dental treatment records in conformity with R.S. 40:1299.96.
La. R.S. 40:1299.96 Health care information; records
(A) * * *
(3)(a) Medical and dental records shall be retained by a physician or dentist in the original, microfilmed, or similarly reproduced form for a minimum period of six years from the date a patient is last treated by a physician or dentist.
(b) Graphic matter, images, X-ray films, and like matter that were necessary to produce a diagnostic or therapeutic report shall be retained, preserved and properly stored by a physician or dentist in the original, microfilmed or similarly reproduced form for a minimum period of three ears from the date a patient is last treated by the physician or dentist. *61 Such graphic matter, images, X-ray film, and like matter shall be retained for a longer period when requested in writing by the patient.
La. R.S. 37:776(A)(24) Causes for non-issuance, suspension, revocation or imposition of restrictions of dental license
A. The board may refuse to issue or may suspend or revoke any license or permit or impose probationary or other limits or restrictions on any dental license or permit issued under this Chapter for any of the following reasons:
* * *
(24) Violation of . . . any provision of this Chapter.
Dr. Shiplov contends he did nothing out of the ordinary. He "kept" the records of the care of each patient and an assistant "kept" the records of the payment and payment methods. He suggests that he did what was pragmatic: filing the records in the office and leaving them there when he left since the patients were more likely to return to Monkhouse Drive for follow up service than to try to find him at another clinic. He contends that leaving the records at the clinic with Dr. Wilkins and/or Mr. Dudley constituted a "system" for the maintenance of the records.
We think Dr. Shiplov uses the word "kept" in a different context than that in which it is used in La. R.S. 37:757. When he says he "kept" a record and that his assistant "kept" the financial records, he means they actually created or recorded data in some fashion contemporaneously with the rendition of the service or payment and stored it in the office where the service was rendered. However, our reading of the statute, especially paragraph (B), leads us to conclude that "keep" is used in the sense of maintaining and preserving the data that was recorded at the time of rendition of service or payment for a certain time period. A dentist does not discharge his duty under the statute merely by making a contemporaneous record. Once he makes the record he must preserve the information for future reference for the period specified in La. R.S. 40:1299.96(A)(3).
Dr. Shiplov relies on Williams v. Golden, 95-2712 (La.App. 4 Cir. 7/23/97), 699 So.2d 102, for the proposition that having a system in place to preserve patient records satisfies his obligation. We find his reliance on this case not well founded. Williams was a medical malpractice case in which the plaintiff produced an expert witness who testified that a doctor has the responsibility to assure there is a system in place to preserve a patient's records. The defendant doctor contended he was not the custodian of the records because he worked for an entity that had separate personnel to manage the records. A panel of this court used the fact that the doctor himself could not produce the plaintiff's missing records, despite his "system," to draw an adverse inference that the plaintiff's records would have been unfavorable to the doctor. This case provides no support for Dr. Shiplov.
There is no merit to Dr. Shiplov's argument that the Board erroneously found he failed to keep written records of his dental treatments.
III. FAILURE TO COOPERATE:
The Board concluded that "Dr. Shiplov violated La. R.S. 37:776(A)(27) for failing to cooperate with the Board investigation" when he did not produce documents requested in a September 3, 1999 letter from its counsel; when he did not produce any documents or appear to testify on December 8, 1999 as ordered by a subpoena and subpoena duces tecum of *62 November 1, 1999; and when he did not produce documents requested in a June 17, 2000 subpoena duces tecum from the Board.
The relevant part of La. R.S. 37:776 states:
A. The Board may refuse to issue or may suspend or revoke any license or permit or impose probationary or other limits or restrictions on any dental license or permit issued under this Chapter for any of the following reasons:
* * *
(27) Failing to cooperate with the board in investigating any matter before the board except for an openly expressed claim of a constitutional privilege; or knowingly failing to respond to a lawful demand from the board for information from any professional licensing or disciplinary authority.
Dr. Shiplov argues that he in fact cooperated with the Board since he responded to its first subpoena of March 25, 1998. The Board does indeed acknowledge this was satisfactory. He submits that his letters to Board counsel after receipt of the subsequent letter requests and subpoenas showed he did cooperate with the Board. The fact remains, though, he never provided the documents sought in the various request letters and subpoenas nor did he appear for the sworn statements and depositions as requested and required. While Dr. Shiplov may not have totally thumbed his nose at the Board, like the Board and the Court below, we are unable to find he cooperated. According to the American Heritage Dictionary of the English Language, Fourth Edition, the word "cooperate" imports a willing acquiescence or compliance. Nothing he did demonstrated a willing acquiescence or compliance with the Board's information seeking process.
In reality Dr. Shiplov acknowledges his lack of compliance by arguing that he was justified in not complying because of his perceived harassment and the assertion of his "constitutional privilege." Objectively we are not able to find the subpoena requests constituted harassment. While they might have been bothersome and unsettling to a layman, they were not abusive, and they legitimately sought information to which the Board was legitimately entitled in resolving the issues associated with its investigation. If Dr. Shiplov really felt he was being harassed by the action of the Board's counsel it was incumbent upon him to seek redress through Motions to Quash or other appropriate pleadings directed to the Board. Mere protestations to the Board's attorney were insufficient to redress the matter.
Dr. Shiplov's reliance on the assertion of his "constitutional privilege" is likewise misplaced. The inclusion of that language in La. R.S. 37:776(A)(27) prohibits the Board from finding a lack of cooperation when a dentist legitimately asserts a constitutional privilege. It does not confer upon a dentist an absolute right to thwart a legitimate investigation simply by asserting non-specific constitutional rights. We recognize that a person may claim his Fifth Amendment right against self-incrimination in an administrative proceeding. However that privilege does not extend in such proceedings to documents that are required to be maintained as a matter of law. Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); Louisiana State Bar Ass'n v. Chatelain, 513 So.2d 1178 (La.1987).
The investigation of Dr. Shiplov centered on his financial arrangement with Mr. Dudley and the doctor-patient records. These are not criminal proceedings and nothing sought by the Board could expose Dr. Shiplov to criminal prosecution. In *63 any event, to properly invoke the privilege it was incumbent upon him to file some pleading to quash the subpoenas for the documents. To assert a testimonial or other privilege he needed to appear for the deposition and claim the privilege on the record if and when he was asked a question that might incriminate him.
IV. CONDUCT OF THE PROCEEDINGS:
A. Alleged Harassment by Complaint Counsel.
In his next assignment of error Dr. Shiplov asserts the trial court erred in not considering his and his wife's affidavits submitted to the Court five months after he filed the petition for appeal and almost six months following the Board's adjudication. The gist of Dr. Shiplov's affidavit is that he felt complaint counsel, Mr. Arceneaux was harsh, mean-spirited and over-zealous in conducting the investigation. He attributes Mr. Arceneaux's perceived behavior to the fact that he and Mrs. Shiplov were friendly with and helped Mr. Arceneaux's ex-wife during the Arceneaux's divorce. Mrs. Shiplov's affidavit details the pre-divorce relationship between the Shiplov and Arceneaux families. It concludes stating that the Shiplovs tried to be supportive of the ex-Mrs. Arceneaux and she felt that Mr. Arceneaux, "could have" resented them for that relationship. She contends that Mr. Arceneaux should have recused himself.
We find no error on the part of the court below in not considering the subject affidavits. The governing statutes are La. R.S. 37:786(H) and La. R.S. 49:964:
La. R.S. 37:786. Judicial review of adjudication
* * *
H. The review shall be conducted by the court without a jury and shall be confined to the record. In cases of alleged irregularities in procedure before the agency, not shown in the record, proof thereon may be taken in the court. The court, upon request shall hear oral argument and receive written briefs.
LA. R.S. 49:964. Judicial review of adjudication
* * *
B. Proceedings for review may be instituted by filing a petition in the district court of the parish in which the agency is located . . .
* * *
F. The review shall be conducted by the court without a jury and shall be confined to the record. In cases of alleged irregularities in procedure before the agency, not shown in the record, proof thereon may be taken in the court. The court, upon request, shall hear oral argument and receive written briefs.
For the Civil District Court to take evidence, there would have to exist some "irregularit[y] in procedure." Dr. Shiplov does not allege any specific irregularity in this regard. In his brief the issue concerning these affidavits appears in connection with the argument that he was justified in not cooperating with the Board because he felt "harassed." That subjective feeling, however, does not constitute a procedural irregularity. It is a matter of substance. For the affidavits, to have been considered in the court below they should have been proffered in response to the independent counsel's sustaining of his objections.
We have also considered whether the suggestion in Mrs. Shiplov's affidavit that Mr. Arceneaux should have been recused constitutes procedural error. We have been unable to find in the record where *64 there was a motion to recuse him. Certainly Dr. Shiplov was aware of the facts constituting the basis on which he wanted Mr. Arceneaux recused. Unlike the situation, infra, with Mr. Begue, independent counsel, there was no formal pleading to recuse Mr. Arceneaux. Dr. Shiplov sat on his rights.
Finally, we note there was an opportunity to get these details before the Board at the hearing, but counsel did not take advantage of it. At the conclusion of Mr. Ogden's testimony Mr. Arceneaux inquired of him whether he [Ogden] knew that Mr. Arceneaux had a prior relationship with the Shiplovs. This opened the door for the submission of the facts contained in the affidavits, but Dr. Shiplov's counsel did not avail himself of the opportunity.
B. Failure to Disqualify Independent Counsel.
Next Dr. Shiplov assigns as error the Board's failure prior to trial to disqualify Attorney Brian Begue from acting as its independent counsel pursuant to 46 La. Admin. Code Part XXXIII, Section 923(D):
Section 923. Conduct of Hearing; Record
* * *
D. * * * At any such time, the hearing panel may be assisted by legal counsel, retained by the board for such purpose, who is independent or complain counsel and who has not participated in the investigation or prosecution of the case. If the board or hearing panel is attended by such counsel, the chairman may delegate to such counsel ruling on evidentiary objections and other procedural issues raised during the hearing.
The assignment is based upon the fact that at an earlier hearing held pursuant to La. R.S. 49:961(c), the so-called "Bertucci Hearing," Mr. Begue asked questions of Dr. Shiplov on a variety of subjects. He characterizes this questioning as a breach of Mr. Begue's independence. We have thoroughly reviewed the transcripts of both the Bertucci hearing and the adjudication hearing and cannot say that we agree with Dr. Shiplov's characterization of this testimony. There is no evidence that Mr. Begue was involved in the investigation of the charges or that would otherwise disqualified from acting as independent counsel.
C. Lack of "Dentist to Dentist" Meeting
In this category of alleged errors in the proceedings below, Dr. Shiplov first complains that the Executive Director of the Board, Mr. Barry Ogden, refused to provide Dr. Shiplov with a "dentist-to-dentist" informal resolution procedure. The authority for such an informal resolution procedure is 46 La. Admin. Code Part XXXIII, Section 1103 and 1105:
Section 1103. Initial Review of Complaints
A. After receiving and reviewing the initial complaint against he dentist or dental hygienist, the board president may select informal resolution as opposed to formal adjudication of the complaint, which may include any grounds recited in R.S. 37:776 and 37:777 or any other section of the Dental Practice Act, as amended.
Section 1105. Procedure
A. The president may elect among the following informal resolution procedures.
1. Information disposition number one (correspondence between board and licensee).
* * *
2. Informal disposition number two (conference between board members *65 and licensee on a "dentist-to-dentist" basis).
a. The board shall send correspondence to the licensee outlining the nature of the complaint. The letter will inform the licensee that there is to be a conference, conducted informally, on a personal "dentist-to dentist(s)" basis. The correspondence will also inform the licensee that his appearance is voluntary, that no record will be made of the conference, which records, if any, he is to produce at the conference and the date, time and location of the conference.
b. If the matter is not resolved to the satisfaction of all parties, then, after the board member(s) assigned to conduct the conference have reported to the president of the board, the latter may then recommend whatever further action, if any, he deems necessary.
c. If the matter is resolved, then the disposition thereof shall be kept at the board's office for future reference purposes and the disposition may be treated as a final action by the board, as set forth in R.S. 37:780(B).
Obviously the gravamen of this complaint is that Mr. Ogden, the Executive Director of the Board and not it's president, made the decision not to offer this benefit to Dr. Shiplov. This argument overlooks two very important facts. First, the president's authority to use this informal procedure is discretionary. Dr. Shiplov had no absolute right to be offered this procedure. Secondly, the record does not reflect that Mr. Ogden made the decision not to offer the informal resolution option.
In the first instance a simple reading of the Rules reveals the language is "The president may. . . ." It does not mandate him to exhaust this procedure before utilizing formal proceedings. Secondly, Mr. Ogden's testimony on this issue is as follows:
Q. . . . Do you know if one [informal resolution] was [made available to Dr. Shiplov]?
A. I do not believe an informal under Chapter 11 was offered in this particular case.
Q. Do you know why?
A. Dr. Shiplov's history evidenced the fact that it would have been futile.
This is the only testimony in the record upon which Dr. Shiplov bases his argument that Mr. Ogden denied him the informal procedure. We find Dr. Shiplov's contention mere conjecture. Nowhere does Mr. Ogden say, he made the decision and we cannot infer that he did. All he testified to was that an informal meeting was not offered and the reason it was not offered. The record does not reveal the source of his knowledge.
D. Adjournment without closing arguments, etc.
Next Dr. Shiplov contends it was error to adjourn the hearing without permitting closing argument on the issues of law and policy involved and without giving him an opportunity to file exceptions, briefs and oral arguments to the Board. He bases this argument on 46 La. Admin. Code Part XXXIII, Section 923(B), to wit:
Section 923, Conduct of hearing; Record
B. At an adjudication hearing, opportunity shall be afforded to complaint counsel and respondent to present evidence on all issues of fact and argument on all issues of law and policy involved, to call, examine and cross-examine witnesses, and to offer and introduce documentary evidence and exhibits as may be required for a full and true disclosure of the facts and disposition of the complaint.

*66 And
La. R.S. 49:957. Examination of evidence by agency
When in an adjudication proceeding a majority of the officials of the agency who are to render the final decision have not heard the case or read the record, or the proposed order is not prepared by a member of the agency, the decision, if adverse to a party to the proceeding other than the agency itself, shall not be made final until a proposed order is served upon the parties, and an opportunity is afforded to each party adversely affected to file exceptions and present briefs and oral argument to the officials who are to render the decision. The proposed order shall be accompanied by a statement of the reasons therefore and of the disposition of each issue of fact or law necessary to the proposed order, prepared by the person who conducted the hearing or by one who has read the record. No sanction shall be imposed or order be issued except upon consideration of the whole record and as supported by and in accordance with the reliable, probative, and substantial evidence. The parties by written stipulation may waive, and the agency in the event there is not contest may eliminate, compliance with this Section.
At the outset we note that the record does not reflect that any party, including Dr. Shiplov, requested the opportunity to make a summation to the Board. Although Dr. Shiplov suggests that independent counsel was aware that he wanted to make a argument because he had set up a tripod facing the panel, we are not able to discern that fact from the record before us. The transcript is devoid of any objection to the Board's failure to entertain closing arguments. In any event, we note Dr. Shiplov was permitted to make an opening statement and to argue points of law throughout the hearing. A straightforward reading of Section 923(B) does not specifically confer a right to closing argument, only the right to argument. Considering the record as a whole, we conclude the Board complied with Section 923(B). Assuming, arguendo, that we have misconstrued the rule, we find such an error, if any, harmless because our review of the record is de novo and Dr. Shiplov has been permitted to fully argue all of his contentions before us.
With respect to his La. R.S. 49:957 argument, we find that statute inapplicable. As noted in the opening sentence of the statute, it only applies to situations where a majority of the officials who will render the decision have not heard the case or read the record. That is not the case here. The dentists who made the decision all heard the testimony and arguments at the hearing. Dr. Shiplov's reliance on La. R.S. 49:957 is misplaced.
E. Errors interdicting the Fact Finding Process.
Dr. Shiplov's next assignment of error is that legal errors so permeated the record they interdicted the fact finding process. However, he makes no independent argument in support of this assignment. Even so, to the extent that such legal errors exist, they will be cured by our de novo review.
V. FEES AND COSTS:
Regarding the assessment of fees and costs Dr. Shiplov makes two assignments of errors and this is the issue about which the Board answered the appeal. We will consider them together. First Dr. Shiplov contends the Board exceeded its statutory authority by assessing attorney fees and costs without first imposing a fine or taking *67 some action with respect to his license. Secondly, he asserts the chairman exceeded his statutory authority by assessing the fees and costs and he contests the amount assessed, $24,908.06.
A. Assessment of Fees and Costs Without Fine or License Action
The applicable statute here is La. R.S. 37:780 B(1) and (2). A brief history of this provision is essential to an understanding of the issue and its resolution.
Act 406 of 1988 added the subject subsection to Section 780. As enacted it consisted of only one paragraph. The Louisiana Law Institute, on authority of La. R.S. 24:253 rearranged the statute so that it appeared in the revised statutes as two paragraphs. The first required the Board to make a record of the testimony and it authorized the Board, upon finding the charges sustained by the evidence, to impose certain sanctions upon licensed dentists or licensed dental hygienists. The second paragraph established a range within which the Board could set a fine for each offense and then added: "In addition, the licensed dentist or licensed dental hygienist shall pay [within 30 days] all costs of the committee proceedings, including but not limited to stenographic fees, attorney fees, investigative fees and expenses, and witness fees and expenses and the per diem and expenses of the committee members. . . ." We have compared the words of Act 406 of 1988 to the Law Institute version and find the Law Institute made no material change to the meaning of the statute.
The legislature subsequently amended La. R.S. 37:780(B) by Act 1358 of 1999. That Act amended both paragraphs of subsection (B). Insofar as here relevant, 780(B)(1) was amended to add "unlicensed person" to the list of those the board could sanction upon finding a violation of the statute. A new sentence at the end of the first paragraph permitted the Board to levy an administrative fine and assess all costs of the committee, as recited in the original version of B(2), against unlicensed persons. The only change made to B(2) was to add "unlicensed person" to the list of people who had to pay within 30 days all costs of the committee proceedings.
Dr. Shiplov contends that this amendment effected a significant change to the regulatory scheme. As he reads the amended statute, the administrative fine and assessment of costs provision of B(1) apply only to unlicensed persons. Since the statute uses the permissive "may", he contends the Board has the discretion to impose costs without levying a fine only in cases involving unlicensed persons. He contends that since B(2) uses mandatory language, "The fine shall not be less than five hundred dollars nor more than five thousand dollars per offense" and then goes on to provide "In addition the unlicensed person, licensed dentist or licensed dental hygienist shall pay" within thirty days . . ." all costs, that the imposition of a fine is a prerequisite for condemning a licensed dentist to pay the costs of the investigation and hearing.
We analyze this argument using the following rules of statutory construction:
The fundamental question in all cases of statutory interpretation is legislative intent and the ascertainment of the reason or reasons that prompted the Legislature to enact the law. [Citation omitted] The rules of statutory construction are designed to ascertain and enforce the intent of the Legislature. [Citation omitted] Legislation is the solemn expression of legislative will, and therefore, interpretation of a law involves primarily a search for the Legislature's intent. [citation omitted]

*68 When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the Legislature. [Citations omitted] When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the words of law must be given their generally prevailing meaning. [Citations omitted]
When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole, and laws on the same subject matter must be interpreted in reference to each other. [Citation omitted]
The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter and placing a construction on the provision in question that is consistent with the express terms of the law and with the obvious intent of the Legislature in enacting it. [Citations omitted] The statute must, therefore, be applied and interpreted in a manner, which is consistent with logic and the presumed fair purpose and intention of the Legislature in passing it. [Citation omitted] This is because the rules of statutory construction require that the general intent and purpose of the Legislature in enacting the law must, if possible, be given effect. [Citation omitted] Courts should give effect to all parts of a statute and should not give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided. [Citation omitted] It is likewise presumed that the intention of the legislative branch is to achieve a consistent body of law. [Citation omitted].

Pumphrey v. City of New Orleans, 2005-979 (La.4/4/2006), 925 So.2d 1202 at 1209
Following, these rules, we do not agree with Dr. Shiplov's view of the statute. In simplest terms the amendment of 37:780(B) by Act 1358 of 1999 merely extended the Board's enforcement authority to unlicensed persons who violated the Act. It is a non sequitur to suggest that the addition of the sentence at the end of B(1) which permits rather than mandates the assessment of fines and costs on unlicensed persons requires that a fine be imposed upon a licensed dentist before he can be condemned to pay costs. Subsection B(2) states only that the fine shall not be less than five hundred dollars or more than five thousand dollars per offense. There is no hint of any requirement that it be imposed. The connotation is that if a fine is imposed, then it has to be within that range. The import of the next sentence is that whether or not a fine is imposed, the dentist is still required to pay the costs and fees outlined in the statute. It must be remembered that a fine is only one of the sanctions available to the Board. It may also take some action with respect to the dentist's license, censor or admonish him "or any or all of the above." The legislature intended though, that in any case, the licensed dentist was liable for costs.
Admittedly the 1999 amendment may have created some internal inconsistency within the statute, but we do not find it benefits Dr. Shiplov. By adding the sentence at the end of B(1) permitting the Board to assess an administrative fine and costs against an unlicensed person, there seems to be a direct conflict with the language in B(2) that an unlicensed person shall pay all costs of the committee proceedings. However, we need not resolve *69 this issue at this time because it does not pertain to Dr. Shiplov, a licensed dentist.
B. Chairman Assessment of Costs.
Dr. Shiplov argues that it was improper for the committee chairman to assess attorney fees and costs in the amount of $24,908.06. He contends the assessment should have been by the entire committee. The Board counters arguing that requiring the full Board to vote on assessing the fees and costs and the amount thereof is an unnecessary step because the Board had already voted to find Dr. Shiplov violated the Act and the Chairman was only performing a ministerial act in tabulating the fees and costs to be imposed. We, as the district court agree, with Dr. Shiplov on this point.
The controlling statutes are:
La. R.S. 37:779 (Filing of administrative complaint or charge; appointment of committee to hear charge; quorum.)
* * *
(C) At any hearing held pursuant thereto a majority of the committee shall constitute a quorum and an affirmative vote by a majority of the committee members present shall be required for any disposition, action or decision at the conclusion of the hearing.
(D) For the purposes of this Chapter and Section, a hearing shall have the same effect as an adjudication defined under the Administrative Procedure Act.
La. R.S. 49:951 [Administrative Definitions Procedure Act} as used in this Chapter].
(1) "Adjudication" means agency process for the formulation of a decision or order.
* * *
(3) "Decision" or "order" means the whole or any part of the final disposition . . . of any agency, in any matter other than rulemaking, required by constitution or statute to be determined on the record after notice or opportunity for an agency hearing. . . .
Reading these statutes together, as we must, it is clear that a majority of the quorum must be present not only to arrive at the decision of whether Dr. Shiplov violated the Dental Practice Act, but also for any action or disposition. These latter terms are not defined by the Dental Practice or the Administrative Procedure Act. Therefore we apply their ordinary, everyday meaning. We understand "disposition" in this context to mean the final settlement of the charges against the doctor and "action" to refer to any act of will of the Board. In this light the conclusion is inescapable that a majority of the Board must be present for the hearing, to reach a decision on the charges and to assess the fees and costs.
Citing Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) the Louisiana Supreme Court has noted that due process is an elusive concept with boundaries that cannot be exactly defined. Its content varies according to specific factual contexts. Generally though, due process can be said to embody the differing rules of fair play which through the years have become associated with differing types of proceedings. Driscoll v. Stucker, XXXX-XXXX (La.1/19/05), 893 So.2d 32 at 43. We find Dr. Shiplov has a due process right to have the costs assessed against him after he has had notice thereof and an opportunity to be heard with respect thereto. If this had been a civil proceeding before a court of law he would have been afforded that opportunity since C.C.P. art.1920 provides that court *70 costs are taxed by a rule to show cause, a contradictory hearing.
For the above reasons we affirm the judgment of the trial court.
AFFIRMED.

ON APPLICATION FOR REHEARING
MICHAEL E. KIRBY, Judge.
The Board has not asked us to change our judgment regarding the requirement of a hearing on the motion to tax costs, but it does seek a rehearing for us to clarify the body before which the hearing should be held. In our original consideration of this case we held ". . . [T]he conclusion is inescapable that a majority of the Board must be present for the hearing, to reach a decision on the charges and to assess fees and costs." The Board contends that pursuant to La. R.S. 37:780(B) it is the hearing committee which should conduct the hearing to assess costs.
We do not agree. It cannot be gainsaid that La. R.S. 37:779 provides that a committee of the Board shall hear the charge. Likewise, La. R.S. 37:780(B)(1) provides that if the committee finds the charges sustained by clear and convincing evidence it may impose the discipline specified in the second sentence of Subsection B(1). However, we find no ambiguity in the plain words of the third sentence of Subsection B(1), to wit:
The Board may levy an administrative fine, but it shall assess all costs of the committee,. . . . "
We note further, that the word "board" is a defined term in La. R.S. 37:751(A(2), viz:
(2) "Board" means the Louisiana State Board of Dentistry.
The statutory framework is quite clear: The committee hears the charges and imposes the discipline if the charges are sustained by the requisite standard of proof. However, the legislature reserved to the full Louisiana State Board of Dentistry the power and authority to assess all costs incurred by the committee.
For these reasons we adhere to our original disposition of this matter.
REHEARING DENIED.
NOTES
[1] The limerick is by William Cosmo Monk-house (1840-1901):

There was a young lady of Niger Who smiled as she rode on a tiger; They returned from the ride With the lady inside, And the smile on the face of the tiger.
http://oldpoetry.com/opoem/55485